UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ADYB ENGINEERED FOR LIFE, INC. et al.,

Plaintiffs,

-against-

EDAN ADMINISTRATION SERVICES (IRELAND) LTD et al.,

Defendants.

19-cv-7800 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

Hananya Cohen and Edwin Cohen (no relation) formed a contract more than a decade ago. Hananya was an inventor, Edwin was an investor. Hananya had been working on armor-plate technology, and Edwin wanted to finance it. So they executed an investment agreement and two follow-on letter agreements. Many years later, their relationship fell apart. Despite seemingly little concern for their agreements' terms for the first eight years of their business relationship, they both now seek to enforce those terms against each other. ADYB (Hananya's company) and Hananya bring claims for breach of contract and conversion against EDAN (Edwin's company) and POM Advanced Armor Solutions (PAAS, essentially EDAN's American affiliate). EDAN, PAAS, and Edwin bring counterclaims against Hananya for breach of contract and unjust enrichment.

After several years of litigation, this case was reassigned to this Court on August 14, 2023. From November 13 to November 17, 2023, this Court held a bench trial. "In an action tried on the facts without a jury," the Court "find[s] the facts specially and state[s] its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). The Court sets out its findings and conclusions below. For the reader's convenience, the Court finds certain additional facts in the Conclusions of Law section as it applies law to facts. *See Flatiron Acquisition Vehicle, LLC v. CSE Mortgage LLC*, 502 F. Supp. 3d 760, 769 (S.D.N.Y. 2020) ("For the avoidance of doubt, the Court has also found additional facts that are relevant to the analysis, which are not included in [the Findings of Fact] section of the opinion, but are instead embedded in the [Conclusions of Law] section.").

## FINDINGS OF FACT

The Court finds the following facts by a preponderance of the evidence based on the written direct testimony, trial testimony, and documents admitted into evidence. The Court received direct testimony by affidavit for seven fact witnesses and one expert witness. The expert and four fact witnesses were cross-examined live. None of the admitted documentary exhibits was objected to. *See* Tr. 197:7–19, 200:25–202:11, 526:4–527:11.

In August 2011, Shlomo Mizrachi introduced Hananya and Edwin. *See* E. Cohen Affid. ¶ 5. Mizrachi and Hananya were working together at ADYB, and they explained their armor concept to Edwin. Mizrachi Dep. 12:3–15:21. The plates were made of ceramic, and the innovation was

the use of interlocking cross-shaped pieces. At this time, Hananya already had at least one patent pending on this technology. *See* PX-1 at 3. There were several iterations of this concept, but here is one rendering:



DX-30.

Over the next month, Edwin and Craig Schwimmer (a consultant who would set up PAAS) negotiated with Hananya and Mizrachi. Schwimmer Affid. ¶ 6. In September 2011, they executed an investment agreement. PX-1. The agreement was signed by Hananya, ADYB (represented by Hananya and Mizrachi), Edwin, and "NEWCO" (the placeholder that would become EDAN, represented by Edwin). DX-7 to -8. ("ADYB" comes from the initials of four of Hananya's children, and "EDAN" is a portmanteau of "Edwin" and "Dan." "Dan" refers to Daniel Turetsky, Edwin's friend and fellow investor in the project.) The agreement was drafted by Mizrachi. Mizrachi Dep. 15:15–19:18. The agreement had some interlocking obligations as well as several independent promises. And some of these obligations were changed by later agreements.

## I. "Satisfactory Performance" and subsequent investment

### A. Terms

As the initial phase of the investment agreement, Edwin promised to invest $28,000. PX-1 at 3. That money was earmarked for an "initial ballistic test" and two months' salary for Hananya and Mizrachi. *Id.*

To unlock "a subsequent investment" of $250,000, the technology needed to achieve "Satisfactory Performance" at the initial ballistic test. *Id.* To reach Satisfactory Performance, the "results must prove that [ADYB's] technology meets the minimum requirements to defeat ballistic threats categorized for NIJ [National Institute of Justice] levels 3 and 4 including the 5.56mm NATO round." *Id.* On top of "a subsequent investment," Satisfactory Performance also triggered another promise: within 30 days, EDAN would "provide details of and arrange a site visit … to the manufacturing facility," and "[t]his condition [was] considered a fundamental factor to this agreement." *Id.* at 5. If the technology failed, ADYB promised to "undertake to reach satisfactory performance results at its own expense within 90 days." *Id.* at 4. Even if the technology never achieved Satisfactory Performance, Edwin, "at his sole discretion, ha[d] the right to make any further investment." *Id.*

### B. Initial testing

After signing the investment agreement, Edwin enlisted Schwimmer to help set up ballistic testing. Schwimmer Affid. ¶ 8. Schwimmer, in turn, contacted Mark Gatanas, whose company, VizorNet, set up a test. *See id.* ¶ 9; PX-5. This test was called an "Initial Feasibility Assessment." PX-5 at 3. This "initial limited scope test" was to "DOD [Department of Defense] V50 standards." *Id.* at 3. Its parameters did not match those for the "initial ballistic test" described in the investment agreement's "Satisfactory Performance" provision. (ADYB conceded this point in closing argument when asked by the Court directly. Dkt. 311 at 16:20–18:2.) Rather than using the 5.56mm NATO round, it used the 5.56mm ball and armor-piercing rounds, which use different metals for their jackets and cores. *See* Trial Tr. 550:7–22. The tests were also not in line with typical NIJ body-armor standards in that the plates were freestanding rather than attached to a clay block (which is supposed to simulate a body). Tr. 555:4–556:11.

According to VizorNet's Statement of Work, "[t]hese tests w[ould] provide sufficient validated data … to determine if full NIJ … testing is justified." PX-5 at 3. "Successfully defeating these rounds … will provide the requisite data needed to justify further testing and provide a strong basis for DOD interest and potential support." *Id.* Then, there could be "Follow-on Testing" to "full NIJ … standards." *Id.*

The test was conducted in December 2011. It was largely successful: just one plate suffered "complete penetration," while the others stopped the bullets. DX-230 at 10. Most of VizorNet's final analysis of the tests focused on the armor's readiness for the "DARPA [Defense Advanced Research Projects Agency] Armor Challenge." DX-230 at 10. While the armor absorbed 2,290.37 ft/lbs at the test, it would need to stop 7,735.78 ft/lbs for the DARPA challenge. *Id.* VizorNet said nothing about NIJ standards or NATO rounds.

### C. Other obligations under the investment agreement

Under the investment agreement, EDAN agreed to fund several other things. It promised to (1) "cover all costs needed to develop the market for [ADYB's] technology," (2) "provide minimum government level approved and licensed manufacturing facilities required for Personal, Vehicle, Naval Vessel, Helicopter & Aerospace ballistic armoring manufacturing projects," and (3) "source high level contacts in the defense sector and most importantly, source strategic work order contracts for Personal, Vehicle, Naval Vessel, Helicopter & Aerospace ballistic armoring projects." PX-1 at 5–6. Lastly, the agreement distributed equity. It gave Hananya 7% equity in EDAN and gave Edwin 20% of ADYB. *Id.* at 6.

### D. Memoranda of understanding

In January 2012, EDAN executed two memoranda of understanding (MOUs): one with ADYB and another with Hananya individually. The MOU between ADYB and EDAN restructured the investment agreement's subsequent-investment obligation. It set up a series of payments that "replace[d] the $250,000 Lump Sum payment obligation described in the Investment Agreement." PX-4 at 1. ADYB concedes that those payments were made. Dkt. 311 at 13:25–14:4.

The MOU with ADYB also transferred all of ADYB's assets to EDAN for $30,000. PX-4 at 1. And EDAN reserved the right to transfer those assets to a U.S. company, but only if Hananya had "the right to continued involvement in the research & development activities of the Assets." *Id.* Hananya also agreed to "devote all necessary time and effort to work with EDAN and its designated advisors to review and seek to achieve the maximum patent protection rights … both in the US and other countries." *Id.* at 2.

The MOU with Hananya also had multiple parts. First, "EDAN/Edwin [promised] to fund NIJ certification." PX-3 at 2. Second, Hananya agreed to assign his patents (there were now three) to EDAN. *Id.* at 1. This assignment was for "strategic purposes," including to "extend the Patent to additional countries, as appropriate, [which] w[ould] be funded by EDAN." *Id.* But EDAN was still "bound to carry out the obligations and milestones stated in the Investment Agreement." *Id.*

## II. The benchmarks and the extensions

### A. The agreements' terms

As just discussed, the patents were assigned to EDAN under the MOUs. And EDAN also "successful[ly] complet[ed] [the] subsequent investment phase," so EDAN was entitled to certain rights under the investment agreement. PX-1 at 4. These rights empowered EDAN to "produce and market the current and future technology," and ADYB promised to "support the marketing and sales efforts of [EDAN]." *Id.* at 4–5.

EDAN's power would be "exclusive" and "irrevocable" unless EDAN failed to meet certain benchmarks. *Id.* at 5. (And as mentioned, the MOU with Hananya also referred to these obligations.) Those benchmarks established earnings targets. Sales needed to exceed $3 million in the first year, $10 million within two years, and so on. *Id.* If EDAN "fail[ed] to achieve any of the benchmarks, all the rights of [EDAN] w[ould] be revoked and [ADYB] w[ould] have the sole … licensing and manufacturing rights." *Id.* at 5. But these benchmarks were not triggered until "receipt of certification of NIJ levels 3 and 4 or equivalent rating." *Id.* at 4.

Hananya contended that the benchmarks were running in 2012. The parties had conducted more tests that year, and Hananya testified that, because the testing was done at an NIJ-approved laboratory, the armor had achieved NIJ certification. Tr. 378:21–379:2. Reflecting that belief, Hananya said, in an email at that time, that "the first mil[e]stone … expires in January" 2013. PX-177. In that email, he also said he should be receiving a "reasonable salary in return" for an "extension to the first mil[e]stone." *Id.* Hananya's email refers to a "conversation" in which he and Edwin "agreed" to these terms, *id.*, but there's no other evidence of that agreement or evidence that Edwin acquiesced in Hananya's understanding of when the benchmarks were triggered. EDAN's position in this case is that the benchmarks were never triggered. And a later written agreement spoke more directly to these issues.

That agreement was reached in July 2014, when the parties agreed to extend the benchmarks. As discussed in greater detail later, it's not entirely clear why Edwin agreed to these extensions if he believed that the benchmarks hadn't been triggered yet. In any event, the parties met, along

with Mizrachi, and their agreement was memorialized in an email from Mizrachi. That email split the agreement into three parts: (1) "Edwin Cohen will have a three year extension on the benchmarks," (2) Edwin will pay Hananya escalating amounts ($8,000 per month in the first year, $10,000 in the second, $12,000 in the third), and (3) Edwin "will have the option to extend the benchmark[s] for two additional one year periods. The price for these options shall be $150,000 for each additional one year period." PX-180 at 1–2.

**B. The PPG relationship begins**

As time wore on, the parties continued to experiment with different materials and designs. Schwimmer Affid. ¶ 48. The difficult part was striking the right balance between strength, weight, and cost. *Id.* ¶¶ 53–55. And they continued to test their designs with live rounds. Over the years, they conducted hundreds of tests, all documented in a comprehensive spreadsheet. *See* DX-207.

In 2013, the parties applied for a Small Business Innovation Research (SBIR) award. Schwimmer Affid. ¶ 32. In August of that year, they received $100,000 from SBIR, and EDAN added more than $100,000 on top of that amount. *Id.* ¶ 33; E. Cohen Affid. ¶ 34. In February 2014, they sent a follow-up SBIR report to the U.S. Army Research Laboratory, updating the lab on the status of the technology with the hopes of securing a second round of SBIR funding. Schwimmer Affid. ¶ 34; E. Cohen Affid. ¶ 35. The U.S. Army representative denied them the additional funding but recommended that they work with PPG Industries. Schwimmer Affid. ¶ 37. PPG was a Fortune 200 company with expertise in certain specialty armors, like fighter-jet windshields. *Id.* The parties hoped PPG's scale and resin expertise could solve some of the issues they were having. *Id.*

Soon after that, Schwimmer began to develop a relationship with PPG. *Id.* ¶¶ 38–40. In September 2016, PPG and PAAS agreed to a two-year licensing and development contract. *Id.* ¶ 44. As part of the deal, PPG helped get materials and perform testing for the armor. *Id.* ¶ 47–49. PPG did not make body armor but instead specialized in vehicle armor. Nonetheless, Edwin and Schwimmer thought that working with PPG was the most efficient route to market, and they could always return to body armor once the technology was more developed. *Id.* ¶ 55; E. Cohen Affid. ¶ 53. The point person at PPG for this project was Carlo Scarinci.

**C. The 2017 renegotiation efforts**

In the middle of the two-year licensing agreement with PPG, Hananya's extension payments ran out, and he threatened to pull the plug. In the summer of 2017, he demanded $16,000 per month. *See* PX-183. Zooming out for a moment, this demand would turn out to be an inflection point, but it was not completely out of character—Hananya was mercurial. For example, before the original extension payments were negotiated, Hananya said he was "reconsidering our deal due to you [Edwin] severely ignoring my finance requests." DX-45 at 2. A few months later, after some good news, Hananya sent an email thanking his "dream team." DX-47. In June 2016, Schwimmer emailed everyone to confirm his negotiating position before he approached PPG. DX-54. Hananya replied simply, "Sorry Guys, thats [*sic*] not the way to negotiate." *Id.* But after Schwimmer successfully closed the deal a few months later, Hananya emailed him to say,

"[T]hank you for all your effort and amazing achievement with ppg.I [*sic*] apprichiate [*sic*] everything." DX-59.

Returning to summer 2017, Edwin's lawyer sent a letter to Hananya. He told Hananya that Edwin "decline[d] at this time to make further payments for the additional two year extension, but may do so in the future." DX-64 at 2. About two weeks later, the same lawyer reached out to tell Hananya that "EDAN will move forward without ADYB's cooperation, [but] EDAN prefers to work 'shoulder-to-shoulder' with you." DX-66 at 4. Attached to the email was a term sheet. *Id.* Hananya responded by declaring that Edwin was "in breach of contract" and "NO longer allowed to use or represent my intellectual propert[y]." *Id.* at 3.

The parties seemed to treat these bold declarations less as complete repudiations and more as opening bargaining positions. Over the next several months, the parties attempted to renegotiate their agreements. And Hananya continued to hold out the prospect of a successful renegotiation, saying he was "willing to progress and not go in the other path," whatever that might mean. DX-82 at 1. Neither side seemed to want to destroy what they had built, and they "were having proper conversations about what need[ed] to happen." Tr. 289:24–25.

According to Edwin, he thought he and Hananya had reached an agreement, but then Hananya refused to sign it. E. Cohen Affid. ¶ 67. Understandably, Hananya seemed hesitant to sign an agreement that the other side had drafted while he was uncounseled. Before signing, Hananya asked for $10,000 for a lawyer to review the agreement and $22,000 in further funding for ADYB. E. Cohen Affid. ¶ 70; Turetsky Affid. ¶¶ 16–17. Turetsky offered Hananya the $32,000 in exchange for signing a nonbinding MOU, but Hananya again refused. DX-224 at 1. After a face-to-face meeting at which they seemed to agree to some terms, Turetsky sent Hananya the $32,000. *Id.* at 2.

As negotiations fizzled in December 2017, Edwin was running out of options. Turetsky emailed Hananya, saying he expected and hoped Hananya would continue to support the project, and he told Hananya that EDAN was exercising the first of the one-year-extension options under the original extension agreement from July 2014. DX-86 at 1. By exercising the option, Edwin agreed to resume monthly payments in exchange for delaying the benchmark obligations for another year. And such payments were made in December 2017 and January and February 2018. DX-1 at 47–48. Payments and negotiations both stalled out in March 2018. DX-88.

In April 2018, EDAN learned that Hananya had tried to reassign the patents to himself. In public filings with the U.S. patent office in September 2017, Hananya claimed that the patents were assigned to him by way of "breach of contract." *See* DX-67 to -70. When EDAN learned of these assignments, its lawyer reached out to Hananya's to try to get Hananya to withdraw or otherwise cure these attempted reassignments. *See* DX-89 to -90. In May 2018, Hananya's lawyer responded, doubling down. He echoed Hananya's position from years earlier, saying the benchmarks had begun to run after the December 2011 testing, so it was EDAN who was in breach. DX-141 at 3. The lawyers exchanged more emails in the following months, with no movement by either side. *See* DX-145 to -146. (Fast-forwarding a bit, although these attempted reassignments

gave EDAN headaches and undermined its relationship with PPG, they were not legally effective. The parties agree that EDAN currently owns the patents and will continue to own the patents unless the Court determines that it breached the agreements. Tr. 602:16–21, 604:9–16; *see also* Dkt. 311 at 4:15–6:25; Dkt. 309 at 31:2–9.)

**D. The PPG relationship collapses**

As the parties squabbled, the PPG relationship progressed. In late 2017 and early 2018, PPG told Schwimmer that they had been in contact with a specific U.S. Army research program that had the potential to yield several large grants. *See* Schwimmer Affid. ¶ 67; DX-159; DX-161.

Eventually, though, the fight between the parties spilled over. In July 2018, Hananya sent an email directly to Scarinci, without EDAN copied. He asked for an update on "my technology" and PPG's plans to extend the licensing agreement with PAAS. DX-92. A few days later, he sent the same email to another PPG employee. DX-93. Scarinci emailed the other PPG employee, saying, "Ignore this email for now." DX-169; Scarinci Dep. 170:10.

Scarinci and Schwimmer tried to work around the problem. In August, Scarinci was still committed enough to send a model statement of work. DX-167. In September, Scarinci sent another model statement, and Schwimmer sent a proposed six-month extension to give them runway to "sort out the collective IP." DX-170 to -171. By October, Scarinci was still telling coworkers that PPG "need[ed] to get them [PAAS] on contract." DX-173.

But in November, the cracks began to show. Scarinci forwarded to Schwimmer this email that Hananya had sent to Scarinci:

> POM advanced armor solutions LLC, no longer holds a marketing license for my patents. In my last letter to you I asked if an extension contract was signed with POM without an answer. Therefore, I understand that your company i.e[.] PPG no longer uses the patents invented by me. The inevitable conclusion is that I can continue to market the patents invented by me and without any obligation to your company also I understand that you no longer will be us[ing] my patents.

DX-177. Scarinci asked Schwimmer, "How do we handle?" DX-178; Scarinci Dep. 201:15. At this point, EDAN went into damage control, and its lawyer proposed indemnifying and other language to PPG. *See* DX-179 to -181.

Still, as late as January 2019, PPG was drafting a statement of work to continue the relationship. DX-182; Scarinci Dep. 208:2. But Scarinci was keeping his coworkers apprised that he was "dealing [with] a bunch of issues on this topic of IP with them." DX-183; Scarinci Dep. 227:4–6. And PPG employees were privately talking about abandoning the relationship. DX-184.

In early February, Hananya sent another email to Scarinci:

> Given the upcoming expiration and the further discussions that you have held with the representatives of the Licensors [PAAS], the purpose of this letter is to request termination of any discussion or any further business progress with POM advanced

> armor solutions LLC [PAAS] or any company that may represent them in regards to the above patents or any derivatives of th[e]s[e] patents. Edwin Cohen and Edan Administration Services (Ireland) Limited Dublin are in *breach of contract* with Hananya Cohen and ADYB Engineered for [L]ife Inc. (See attached agreement) we request for the second time that you provide the undersigned with an update on the status of the ongoing discussions.

DX-185 at 1. Again, Scarinci forwarded it to Schwimmer. And this time, he added a more direct plea: "[Another PPG employee is] expressing reservation[s] and suggesting we cut ties. He is predicting law suits [*sic*] in the future. Help me feel better about it, can you or [your lawyer] send … an identification [*sic*] letter referencing patent #'s or anything of the like?" DX-186 at 1. EDAN's lawyer responded with a letter addressing the breach claims and again offering to indemnify PPG. DX-187.

But it was too late. According to Edwin and Schwimmer, PPG said they wouldn't move forward until the issue had been settled by a court. E. Cohen Affid. ¶ 102; Schwimmer Affid. ¶ 87. And Scarinci's testimony confirmed what the emails already make plain: concerns over patent ownership, based on Hananya's emails, attempted reassignments, and objections, torpedoed the relationship. *See* Scarinci Dep. 238:3–246:6. In May 2019, EDAN sued Hananya in this district, but the suit was voluntarily dismissed after the court denied a motion for a preliminary injunction. DX-21; Turetsky Affid. ¶¶ 52–58. Later that year, this suit was filed.

## CONCLUSIONS OF LAW

### I. Jurisdiction and choice of law

The Court has subject-matter jurisdiction under 28 U.S.C. § 1332. Plaintiff ADYB is a New York corporation, and Defendant EDAN is an Irish corporation. Dkt. 45 ¶¶ 2–3. Defendant PAAS is a New York LLC whose sole member is EDAN (as the parties confirmed by email to the Court), meaning it is also Irish for diversity purposes. *Id.* ¶ 4; *Handelsman v. Bedford Vill. Assocs. Ltd. P'ship*, 213 F.3d 48, 52 (2d Cir. 2000). The Court also previously addressed its jurisdiction over Edwin's and Hananya's counterclaims. *See* Dkts. 162, 200.

The parties agree that New York law governs. *See Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011) (the fact that "the parties agree that New York law controls … is sufficient to establish choice of law").

### II. ADYB's breach-of-contract claims

Under New York law, a breach-of-contract plaintiff must show that "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages." *34-06 73, LLC v. Seneca Ins. Co.*, 198 N.E.3d 1282, 1287 (N.Y. 2022) (citations omitted). In interpreting the contract, the Court must "give a fair and reasonable meaning to the language used." *Hughes Commc'ns India Priv. Ltd. v. The DirecTV Grp., Inc.*, 71 F.4th 141, 153 (2d Cir. 2023) (applying New York law).

### A. Satisfactory Performance

#### 1. *Satisfactory Performance was not reached*

The parties spent substantial time disputing whether the technology met "Satisfactory Performance." As noted, ADYB conceded at closing argument that the initial testing did not meet the original requirements in the investment agreement. But it argues that those terms were modified. EDAN, they say, modified the initial-testing requirements when they hired a contractor who designed a test using different ammunition. And ADYB says this modified initial test was successful. EDAN disputes both points. The Court agrees with EDAN on the first point, so it does not reach the second.

ADYB has not shown that the contract was modified. A contract like this one, without a clause prohibiting oral modification, may be modified according to the usual principles of contract formation. *See Fam. Fashions, Inc. v. Sterling Jewelers, Inc.*, 2022 WL 4109720, at *3 (S.D.N.Y. Sept. 8, 2022); *Beatty v. Guggenheim Expl. Co.*, 122 N.E. 378, 381 (N.Y. 1919) (Cardozo, J.); *Williston on Contracts* § 29:41 (4th ed. 2023). "[T]he party seeking to enforce the contract bears the burden at trial to establish that a binding agreement was made and to prove its terms." *Kramer v. Greene*, 36 N.Y.S.3d 448, 450 (1st Dep't 2016).

ADYB's evidence of modification is thin. It notes that EDAN hired VizorNet and that VizorNet's proposed statement of work called its testing an "*initial* feasibility assessment," supposedly tracking the investment agreement's "*initial* ballistic test" language. But the investment agreement was explicit about the kinds of ammunition to use and the consequences that would flow from Satisfactory Performance. Using different language to refer to a different test does not indicate that the original testing conditions were changed. Such an oblique modification would be strange, and ADYB has no testimony or documents (contemporaneous or otherwise) supporting this theory.

ADYB tries to bolster its argument by saying that it relied on the modification. But it points to no evidence showing how Hananya or ADYB changed its behavior or otherwise detrimentally relied on any representation. *See Williston on Contracts* § 6:81. And as explained below, the consequences of Satisfactory Performance turned out to be minor. ADYB has given no reason to believe that everyone's continued work on the technology was tied to the understanding that Satisfactory Performance had been achieved.

#### 2. *Even if Satisfactory Performance was achieved, the resulting obligations were satisfied or waived*

In any event, whether the technology reached Satisfactory Performance is irrelevant. Recall that achieving "Satisfactory Performance" triggered two obligations: (1) the "subsequent investment" of $250,000 and (2) a site visit to a manufacturing facility within 30 days.

The MOU restructured the subsequent-investment obligation, and those payments were made. So the subsequent-investment term was not breached, even if Satisfactory Performance was achieved.

Even if the site-visit term was breached, it was first waived. (This claim would also plainly be time-barred, but EDAN failed to make that argument.) "When a specific time is fixed for the performance of a contract … and it is not performed by that time, but the parties proceed with the performance of it after that time, the right to suddenly insist upon a forfeiture for failure to perform within the specified time will be deemed to have been waived and the time for performance will be deemed to have been extended for a reasonable time." *Williston on Contracts* § 46:14 (citation omitted); *see also Allen v. Kowalewski*, 659 N.Y.S.2d 670, 670 (4th Dep't 1997) (holding that authorizing more work after a timing condition expires constitutes waiver of the condition).

That is what happened here. In January 2012, ADYB, EDAN, and Hananya executed two MOUs, laying out their continuing relationship, and they continued to work together for years afterward. In February 2012, EDAN hired a consultant to identify a production facility. And ADYB agrees that, at least for a time, they had access to a proper facility. Dkt. 311 at 19:2–7. Whether Hananya actually got to visit the facility is unclear but immaterial. The point of the facility was manufacturing, not ogling. True, the contract calls the site visit a "fundamental factor to this agreement." PX-1 at 5. But a "party may waive timely performance even where the parties have agreed that time is of the essence." *Allen*, 659 N.Y.S.2d at 670. So even if ADYB is right that the site-visit term was breached, that would not warrant throwing out the whole contract, and it has not shown any damages that flow from the breach.

**B. The benchmarks and extensions**

ADYB's next claim is for breach of the benchmark provisions. Because ADYB is seeking to enforce the benchmarks, it bears the burden of showing that they were triggered. *Harbinger F&G, LLC v. OM Grp. (UK) Ltd.*, 2015 WL 1334039, at *22 ¶ 131 (S.D.N.Y. Mar. 18, 2015). To do so, ADYB must show that the technology was in "receipt of certification of NIJ levels 3 and 4 or equivalent rating." PX-1 at 4.

*1. The benchmarks were never triggered by achieving a rating*

The technology never received NIJ certification. Hananya testified that one of the early rounds of testing constituted NIJ certification because it was conducted at an NIJ-approved laboratory. Tr. 378:21–379:2. That conclusion is mistaken. NIJ certification is a formal process that involves submitting a finished armor product to an independent tester, satisfying certain conditions, and being placed on an officially approved list. Tr. 572:11–575:22. The armor never went through that process. *See, e.g.*, Tr. 387:23–388:8. And at closing argument, ADYB didn't argue that the technology actually received certification. Instead, ADYB focused on the "equivalent rating" language and on reliance. Dkt. 311 at 16:20–18:2, 31:10–17, 39:4–42:23.

On "equivalent rating," ADYB says that term covers a variety of metrics, including other countries' rating systems, the joules the armor could absorb or withstand, testing for non-body armor, and so on. But this term is ambiguous, and the evidence reveals a narrower understanding. When asked directly, Hananya testified that "equivalent rating" meant a comparable approval in another country. Tr. 494:18–496:11. Although Hananya used joules to describe how one might decide which ratings are "equivalent," he didn't say that testing alone was enough for a "rating." Edwin

had the same understanding, testifying that "equivalent rating" meant ratings from other countries. Tr. 175:22–176:5. The contractual context also points to something concrete: the words "receipt" and "rating" imply an official designation from a third party. Plus, "equivalent rating" is an alternative to NIJ certification. There is no evidence that "equivalent rating" was intended to be a radical loophole to NIJ's highly reticulated process. And that would be especially strange given that extremely demanding sales benchmarks were tied to achieving such a rating. So "equivalent rating" meant some kind of formal approval, likely from another country. The technology never received such a rating.

*2. The benchmarks were not triggered by reliance*

ADYB's better argument is that EDAN should be estopped from arguing that the benchmarks weren't triggered. To estop EDAN, ADYB must show that (1) EDAN made a representation of fact by words or conduct, (2) ADYB had "a right to rely on it and must [have done so] reasonably without knowledge or means to learn the true state of affairs," and (3) letting EDAN backtrack would injure ADYB due to its reliance. *Williston on Contracts* § 8:3; *see also Gen. Auth. for Supply Commodities v. Ins. Co. of N. Am.*, 951 F. Supp. 1097, 1111 (S.D.N.Y. 1997).

EDAN did make a representation that could be interpreted as conceding that the benchmarks had been triggered. Hananya had been badgering EDAN that the first milestone would expire in January 2013 and that he wanted a "reasonable salary in return" for delaying that date. DX-143. In response, Edwin and Hananya agreed to a "three year extension on the benchmarks" and Hananya got paid for the next three years. PX-180 at 1. Although Edwin says he "totally disagreed with Hananya's claims that NIJ Certification had been achieved," there is no contemporaneous evidence of that claim, and Edwin admitted that he didn't remember whether he told Hananya his view at the time. *Compare* E. Cohen Affid. ¶ 57, *with* Tr. 249:17–21.

EDAN tries to explain the extension payments differently. Rather than conceding that the benchmarks were going to be triggered soon, the extensions were really to the sales-target timeframes *after* getting NIJ certification. That is, EDAN says the extension gave it four years (rather than one) to achieve the first sales target after getting certified. That explanation isn't implausible, but $360,000 is a steep fee to simply extend a hypothetical future deadline.

EDAN has a second explanation that undercuts its first and is more realistic. It says that it paid Hananya just to keep the peace. Hananya had already been making noise about backing out of the deal, so it makes sense that EDAN wouldn't fight him on what the money was really for. But that failure to explain or couch its action means it could be read as making a representation about whether the benchmarks had been triggered. So the first estoppel element is likely satisfied.

But the last two elements are not. There is no evidence that ADYB or Hananya relied on EDAN's representation, let alone reasonably or injuriously. For starters, emails from November 2013 show Hananya reaching out to a laboratory about certification testing for NIJ level 4. *See* DX-41 to -42. Those emails show Hananya's understanding that the armor was not in "receipt of certification of NIJ levels 3 and 4." PX-1 at 4. Equivalent rating could still be possible, but Hananya testified that he thought the 2012 Chesapeake testing had achieved NIJ certification.

Tr. 378:24–379:5. That testimony simply isn't credible in light of these emails. Nor would that understanding be reasonable given NIJ's clear, strict requirements. In light of how things played out, it's clear that Hananya simply felt the original contract was not properly compensating him. Because that contract had tied his compensation to the product's success, he was strapped for cash and needed to extract short-term concessions. He did so by asserting that the benchmarks were coming due, but he could not then reasonably rely on EDAN's concession to his demand as a concession of fact.

And even if he did so rely, there's no evidence that letting EDAN go back on its representation would injure him. He got paid for three years and continued to develop his technology on EDAN's dime. The closest he could get to reliance would be based on his later breach. His story would go something like this: EDAN induced Hananya into thinking that the benchmarks were running. So once they stopped paying him, he thought EDAN was in breach. Because he thought EDAN was in breach, he abandoned the contract, so he can't be held responsible for that abandonment. But he didn't make this argument, and for the reasons below, this story does not work out.

3. *Even if the benchmarks were triggered, Hananya breached before the extensions ran out*

Even if the benchmarks were triggered at some point, they were delayed by the extension payments. The agreement struck in July 2014 gave Edwin a "three year extension on the benchmarks" so long as he made monthly payments. PX-180. Edwin made those payments for the three years, taking us to July 2017. DX-1 at 44–47. At that point, the agreement gave Edwin the "option to extend the benchmark[s] for two additional one year periods." PX-180. Because "no time [was] stated" for exercising the option, it needed to be exercised "within a reasonable time." *Williston on Contracts* § 5:20.

It was exercised within a reasonable time here. Turetsky told Hananya the option was being exercised in December 2017, and payments resumed for three months. Although there were four unpaid months between the July and December payments, that gap wasn't unreasonable. During that time, the parties were negotiating a possible resolution that might have obviated the need to exercise the option. The reasonableness of waiting is also confirmed by the parties' history. Recall that the first time Hananya insisted that the benchmarks were coming due, eighteen months passed before the parties executed the extension-payment deal. Separately, Edwin did not repudiate the option. In August 2017, Edwin "decline[d] at th[at] time" to exercise the option, but he expressly reserved the possibility of "do[ing] so in the future." DX-64 at 2. Because the option was validly exercised, the extension agreement covered the period up until Hananya breached (as explained below). And after that breach, EDAN's performance with respect to the benchmarks was excused. *See Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 23 (2d Cir. 2018); *Williston on Contracts* § 39:7. So even if the benchmarks were triggered, EDAN was never in breach.

4. *The extension payments were not a perpetual salary*

Finally, Hananya points to a June 2016 email that supposedly modified the original extension agreement. In that email, Hananya described the payments as "$12,000 for [the] third year and

on." PX-179. He says that meant he was owed $12,000 per month in perpetuity. Tr. 419:18–24. But there is no evidence of even a response to this email, and it plainly does not represent the terms of the original agreement. So this argument is meritless.

### C. Other terms

Lastly, ADYB and Hananya claim that EDAN breached many of the various obligations from the investment agreement and MOUs.

*First*, Hananya says he was never given his 7% stake in EDAN (or "NEWCO" in the investment agreement). EDAN's only response is that this claim is untimely. *See* Dkt. 232 at 21–22. It asserts that the claim accrued in September 2011, when the investment agreement was signed. *Id.* But the promise here was that Hananya "will receive seven percent … of equity in NEWCO." PX-1 at 6. This obligation sets no definite timeframe, and EDAN put in no evidence to interpret its terms or establish the proper date of accrual. In context, the promise uses prospective language for an obvious reason: NEWCO hadn't been formed yet. If anything, then, the right accrual date is when NEWCO was formed. EDAN hasn't submitted any evidence on that question, so they've failed to carry their burden to prove this affirmative defense. The Court will award the 7% in EDAN to Hananya.

But this award does not cancel the rest of the agreements or return the patents to ADYB. Under the investment agreement, EDAN's rights are revoked only if it fails to achieve the benchmarks. PX-1 at 5. True, the MOU between Hananya and EDAN says the patents will "be automatically assigned to ADYB, and the Investment Agreement will be considered null and void" if "the milestones and obligations set out in the Investment Agreement are not met." PX-3 at 1. But Hananya never connected the 7% term (or any term, for that matter) to that broader language.

Even if Hananya did make that argument, it would fail. The phrase "milestones and obligations" is clearly meant to refer to the sales benchmarks and the series of promises listed under "Responsibility of the Investor." *See* PX-1 at 5–6. The 7% promise is set apart in the "Compensation" section. *Id.* at 6. And the proper remedy for failing to assign equity on a piece of paper (because EDAN has yet to turn a profit) is not canceling out the whole relationship, but simply awarding Hananya that equity. *See Williston on Contracts* § 63:3. That approach is confirmed by the fact that the parties worked together for years after this equity should have been transferred.

Further, even whether EDAN has truly "not met" its obligation to transfer the equity is unclear. Hananya frames the 7% term as a continuing obligation, saying EDAN can fulfill it at essentially any time. And there is some question based on the evidence presented here about whether EDAN did so. *See* Dkt. 298 at 178:14–25 (Edwin's testimony suggesting that Hananya received 7% in IMAS, the corporation that was initially NEWCO before EDAN); DX-218 at 3 (spreadsheet listing ADYB as holding 7% equity in EDAN). At bottom, EDAN didn't challenge this claim on the merits, so the Court finds that EDAN breached and Hananya is entitled to 7% equity in EDAN. But the language of the agreements, shortcomings in party presentation, and quirks in the evidence mean that the relief will go no further.

*Second*, Hananya and ADYB say EDAN failed to extend and maintain the patents in foreign countries. This claim fails for multiple reasons. To start, EDAN's obligation was basically advisory. It promised to "extend the Patent to additional countries, as appropriate." PX-3 at 1. ADYB has not shown why it was appropriate to extend the patents to other countries or evidence of an understanding that it was "appropriate." Once the PPG deal took shape, maybe it just didn't make business sense to maintain the patents all over the world. The initial desire to extend the reach of Hananya's patents seems to have been overtaken by the need to develop armor that could be commercialized. For the same reason, failure to maintain the patent abroad likely wasn't a material breach, and no evidence was admitted at trial demonstrating that it was. Plus, the responsibility went both ways. Although EDAN agreed to "fund[]" extensions of the patents, Hananya agreed to "devote all necessary time and effort to work with EDAN … to achieve the maximum patent protection rights … both in the US and other countries." PX-3 at 1. So even if EDAN wasn't perfect, Hananya has not shown that he performed his end either. There is no evidence that he brought the patent-maintenance issue to EDAN's attention and EDAN simply refused to fund it.

*Third*, ADYB says EDAN's status as an Irish company breached EDAN's obligation to "source high level contacts in the defense sector." PX-1 at 6. But it's not clear how this fact was a breach, let alone a material one. ADYB points to some regulatory issues and even some mild concerns from PPG, but the PPG deal proceeded apace anyway. Plus, EDAN used PAAS (an American company) as a regulatory workaround, which ADYB hasn't shown was insufficient or a breach in itself. Nor has ADYB shown that any damages resulted from EDAN's Irishness.

*Fourth*, ADYB says EDAN failed to "provide minimum government level approved and licensed manufacturing facilities required for Personal, Vehicle, Naval Vessel, Helicopter & Aerospace ballistic armoring manufacturing projects." *Id.* It says this was a continuing obligation, and EDAN breached at least because PPG did not manufacture body armor. But this promise had no deadline. So even if ADYB showed that timeliness was essential (which it hasn't), the Court would imply only a reasonable deadline. *See* Restatement (Second) of Contracts § 204 (1981).

Here, EDAN did not exceed the reasonable window for this sprawling obligation. EDAN and PAAS established a relationship with PPG, which had high-level manufacturing facilities. And even after trial, it remains unclear whether these facilities could manufacture body ("Personal") armor, even if it wasn't PPG's specialty. In any event, it was reasonable to secure a facility that checked many boxes, and by doing so, EDAN had at least partially performed this obligation. And ADYB has not shown that EDAN would not fulfill the body-armor obligation in the future. Once the parties' focus was on the PPG relationship, it was reasonable to leave the body-armor manufacturing for a time when the technology had matured. Finally, to the extent that it was a breach for EDAN not to have a body-armor-specific facility lined up ahead of time, no evidence suggests that breach was material.

*Fifth*, ADYB says EDAN failed to "cover all costs needed to develop the market for [ADYB's] technology" and to "fund NIJ certification." PX-1 at 5; PX-3 at 2. Again, ADYB faces problems of discretion and timing. On discretion, EDAN's obligation was to "cover all costs needed." PX-1 at 5. ADYB complains that no single design was ever pursued to market and that, even after

years of development, they were making some of the plates "with flip-flops from Michael's." Tr. 138:10. And it's true that even EDAN's expert said that some designs' test results were promising enough to warrant "further development." Tr. 584:25–585:6. But EDAN poured millions of dollars into the technology over the years. And the progress with PPG suggests that there weren't critical issues. ADYB has failed to identify any specific cost that EDAN was unwilling to cover, let alone one that was "needed."

As for timing, there was no deadline attached to funding NIJ certification. So, again, it needed to be accomplished within a reasonable time. And for the same reasons as above, it was reasonable for EDAN to continue to press the PPG relationship rather than focus on NIJ certification. Plus, ADYB never proved that any plate design would have actually been certified, so they have not shown that any breach was material or that any damages were caused by the breach. Relatedly, there is a highly suggestive lack of evidence on this question (and on many questions in this case). Contemporaneous emails and other documents suggest that the parties' focus had simply shifted, and it wasn't until litigation started (or shortly before then) that anyone seemed to care about funding NIJ certification. These gaping holes in the evidence aren't dispositive, but they are probative of materiality, reasonableness, and potential modifications or waivers.

*Sixth*, Hananya says EDAN violated his right of "continued involvement" with the armor's research and development. PX-4 at 1. For this claim, he points to a handful of his own melancholy emails at various times. But these again lack specificity. It's unclear what part of the technology's development he was left out of and why that exclusion was material. And all of ADYB's damages claims are framed in terms of lost profits and development costs; he has not linked any of those damages to this claim. Indeed, the provision itself says only that EDAN's right to transfer the intellectual property to a U.S. company is conditioned on Hananya's continued involvement, so any breach would only shift the property from PAAS back to EDAN. PX-4 at 1.

**D. Even if EDAN breached, ADYB wouldn't be entitled to lost profits**

Finally, even if EDAN breached, most of ADYB's damages claim would fail anyway. More than two-thirds of its $30 million damages claim is based on lost profits.

"Under New York law, the recovery of lost profits as damages for breach of contract is subject to the following stringent requirements: First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes.… In addition, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1577 (2d Cir. 1994) (cleaned up).

ADYB has neither proven the losses with reasonable certainty nor shown that lost-profit damages were "fairly within the contemplation of the parties." *Id.* On reasonable certainty, ADYB starts from behind by failing to have an expert put forth a viable model supported by any hard

evidence. In fact, ADYB didn't have an expert at all. Instead, it relies almost entirely on Schwimmer's internal projections. *See* Dkt. 309 at 26:10–27:2. But these projections were self-consciously preliminary. When he circulated the projections, Schwimmer said that he "made a number of assumptions that require conversation" and that the projections were a "working model[,] not a final draft." PX-234 at 11. Among the things that needed to be discussed or added were the most basic building blocks: "pricing and demand," future and deferred salaries for Edwin and Turetsky, and "changing the legal structures" of the companies. *Id.* at 1–4, 11.

And even if the projections were assembled with the utmost care, they don't show future profits with "reasonable certainty." Recall that the parties had been working on the technology for more than five years without much to show for it. Although the PPG deal was certainly promising, projecting profits for a company that had never had any was bound to be guesswork. Typically, "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000). ADYB's evidence is no different; it is not based on "known reliable factors." *Id.* (citation omitted).

As for the contemplation of the parties, ADYB simply has no evidence that the parties considered lost profits. No evidence shows that at the time of the parties' investment agreement (or any time before this lawsuit), the parties contemplated this kind of remedy in the case of a breach by either side. Instead, ADYB analogizes this case to *Travellers*, claiming that EDAN's control over the technology's direction entitles ADYB to lost profits. *See* 41 F.3d at 1578. But *Travellers* was about one entity's "control over the demand" of another's product. *Id.* In that situation, it was predictable that a breach of contract would lead to declining demand (particularly "[a]fter reviewing the parties' 20 year relationship") and would give rise to a claim for lost profits. *Id.* Here, by contrast, EDAN might've had substantial control over the technology's development, but not over its demand. The two entities' interests were aligned on that point. This case is more like *Schonfeld*, which held that the party "promising to … fund" the agreement "cannot be supposed to have assumed liability for … lost profits that might have been garnered in the future by a non-existent operating entity." 218 F.3d at 175.

This conclusion is even stronger here because the contracts specify a remedy for not making money. *See Kenford Co. v. County of Erie*, 537 N.E.2d 176, 179 (N.Y. 1989). The agreements say that if EDAN fails to meet the benchmarks, all rights to the patents revert to ADYB. So the remedy the parties contemplated would be handing over the patents, not all the money they hoped to make.

## III. ADYB's conversion claim

ADYB also has a conversion claim for EDAN's possessing the patents. "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006). ADYB's claim that EDAN's control was "without authority" and interfered with ADYB's "right of possession" hinges on its breach-of-contract claims: if EDAN breached, then the patents were supposed to go back to ADYB. Because the contract claims fail, this one does too.

## IV. EDAN's breach-of-contract counterclaim

Under the investment agreement, Hananya licensed the patents to EDAN and gave EDAN the exclusive right to "produce and market the current and future technology." PX-1 at 4. ADYB also promised to "support the marketing and sales efforts of [EDAN]." *Id.* at 5. Hananya breached these provisions by publicly trying to reassign the patents to himself and by telling PPG (repeatedly) that he was the legitimate owner of the patents, sabotaging the deal.

For this breach, EDAN has claimed only reliance damages. *See* Tr. 603:10–17. EDAN does not seek expectation damages, such as the future value of the PPG deal. Instead, it seeks to recover every cent it ever invested in the technology or paid to Hananya. But Hananya's breach doesn't justify that kind of recovery. Reliance damages are for "the actual expenditure made in preparation for performance or in performing the work which has been induced by the defendant-promisor." *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 46 (2d Cir. 1995) (internal quotation marks omitted) (citing Restatement (Second) of Contracts § 349). And the non-breaching party can recover those expenditures "to the extent that they are wasted if performance is abandoned." *Lieberman v. Templar Motor Co.*, 140 N.E. 222, 225 (N.Y. 1923) (Cardozo, J.); *see also Kleartex (U.S.A.), Inc. v. Kleartex SDN BHD*, 1994 WL 733688, at *15 n.6 (S.D.N.Y. June 9, 1994) (noting that reliance damages are available "only for wasted efforts"); *Summit Props. Int'l, LLC v. Ladies Pro. Golf Ass'n*, 2010 WL 4983179, at *6 (S.D.N.Y. Dec. 6, 2010); *V.S. Intern., S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1198 (S.D.N.Y. 1994).

This "waste" question turns on whether the claimant has carried its burden to prove the "fact of damage" with "reasonable certainty." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 111 (2d Cir. 2007). Or put another way, the question is whether the claimant has shown a "causal link" between the breach and any losses. *Merry Gentleman, LLC v. George & Leona Prods.*, Inc., 799 F.3d 827, 830 (7th Cir. 2015); *see also Accent Delight Int'l Ltd. v. Sotheby's & Sotheby's Inc.*, 2021 WL 2418225, at *4 (S.D.N.Y. June 14, 2021).

EDAN hasn't done so. For some of its payments, EDAN has "already received the benefit of its bargain." *Summit*, 2010 WL 4983179, at *5. For example, EDAN seeks reliance damages for the extension payments. But the extension payments were just that—payments for extensions. Even according to EDAN's reading of the extension agreement, EDAN paid Hananya for a specific amendment to the contract, giving it four years after NIJ certification to reach the first benchmark. EDAN got that extra time, and it's one of the many bases for the Court's finding that EDAN didn't breach the parties' contracts. So EDAN got the benefit of its bargain.

Most of EDAN's other payments are not recoverable because they are baked into the value of the patents. As noted, both sides agree that EDAN currently owns the patents and will continue to own them because the Court has found that EDAN didn't commit any contract-unwinding breach. Tr. 602:16–21, 604:9–16; Dkt. 311 at 4:15–6:25; Dkt. 309 at 31:2–9; *see also Williston on Contracts* § 39:32; *Capax Discovery, Inc. v. AEP RSD Invs., LLC*, WL 5815943, at *8 (W.D.N.Y. Sept. 30, 2020), *aff'd sub nom. Baiocco v. AEP RSD Invs., LLC*, 2022 WL 2902081 (2d Cir. July

22, 2022).[1] And there is nothing to suggest that the breach impaired the value of the technology itself. During the renegotiations with Hananya, for instance, EDAN said that it would "move forward without ADYB's cooperation." DX-66 at 4. And EDAN argued here that its ability to use the patents has been stymied "with this litigation pending," but there "is absolutely a possibility" that EDAN could "monetize the patented technology" if the "cloud over the patents" was lifted. Dkt. 309 at 55:2–12. So EDAN can't claim that the breach "cause[d] the complete loss of [its] investment." *Merry Gentleman*, 799 F.3d at 831; *see also V.S. Intern.*, 862 F. Supp. at 1198 ("[P]laintiffs cannot contend that their start-up expenses were rendered useless" where they "have continued to receive the benefits of their investment, and have shown no actual damages.").

EDAN comes closer in claiming that Hananya's breach rendered its spending on the PPG deal useless. But this claim still fails. Even on EDAN's account, the PPG deal seemed only to go on hold pending the resolution of this case: Edwin and Schwimmer testified that "PPG informed [Schwimmer] that it will not reconsider moving forward with PAAS unless there is a decision from a court resolving the issues with Hananya." E. Cohen Affid. ¶ 102; Schwimmer Affid. ¶ 87; *see also* Dkt. 225 ¶ 171. So the Court is again left to speculate as to whether Hananya's breach in fact damaged EDAN. Imagine that the Court awarded EDAN PPG-related damages and then the PPG deal was back on a few months later. Those damages would not "restore plaintiffs to their *status quo ante* … but would instead constitute a windfall for [EDAN]." *Summit*, 2010 WL 4983179, at *6 (internal quotation marks omitted). Even if rekindling things with PPG is unlikely, it is EDAN's burden to show the fact of damages with reasonable certainty. Yet the only evidence it put in on this question raises the possibility of a reconciliation. Given that uncertainty, the Court will not award reliance damages. *See Merry Gentleman*, 799 F.3d at 832 ("Reliance damages are not insurance. Courts 'will not knowingly put the plaintiff receiving a reliance recovery in a better position than he would have occupied had the contract been fully performed.'" (quoting *Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 729 (2d Cir. 1992))); *Interfilm, Inc. v. Advanced Exhibition Corp.*, 672 N.Y.S.2d 309, 310 (1st Dep't 1998) (similar).

### V. EDAN's unjust-enrichment counterclaim

For EDAN's unjust-enrichment claim, it "must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (cleaned up). "In a broad sense, this may be true in many cases, but unjust enrichment is not a catchall cause of action to be used when others fail. It is available only in

---

[1] The Court also notes that ADYB filed a conditional reassignment for one of the patents during this suit. *See* https://assignment.uspto.gov/patent/index.html#/patent/search (Patent No. 8402876). ADYB assured the Court that it was only "lodg[ing] [its] claim of rights" pending a decision here. Dkt. 311 at 6:8–17. But the patent office's regulations say conditional assignments are "regarded as absolute assignments for Office purposes until cancelled … by the decree of a court." 37 C.F.R. § 3.56. So, to be safe, the Court cancels the conditional assignment in the decretal language below.

unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff. Typical cases are those in which the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).

Here, EDAN's unjust-enrichment claim is again based on the payments it made to Hananya. It says its claim "for Unjust Enrichment against H. Cohen [is] only for payments made to H. Cohen including under the agreements and for his representation that he would enter into a new agreement." *See* Dkt. 225 ¶ 174; *accord* Dkt. 285 at 17. Of course, any payment made "under the agreements" fails immediately—an unjust-enrichment claim cannot be brought when there was a valid contract. *See EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 33–34 (N.Y. 2005).

As for Hananya's "representation that he would enter a new agreement," EDAN is referring to the $32,000 that Turetsky sent to Hananya in October 2017. But when Turetsky initially offered the money, he recognized that he was making the offer "[a]gainst legal advice" and without Hananya promising to do anything in return. DX-224 at 1. He asked only that Hananya sign a non-binding MOU. *Id.* When Hananya refused to sign the MOU, Turetsky didn't send the money. Instead, they had a face-to-face meeting, and Turetsky sent the money after that meeting. *Id.* at 2 ("On the basis of our meeting yesterday where we decided ADYB and EDAN would agree to appoint directors from family rather than Edwin and yourself, and due to Shlommo [*sic*] underwriting the payment, I have forwarded funds to ADYB and Shiboleth llp [Hananya's lawyer].… We agreed to extend the deadline from October 31st only if necessary to Nov 6th.").

So this unjust-enrichment claim fails in one of two ways. Either (1) Turetsky knew that he was sending the money without any promise from Hananya, meaning Hananya is "entitled" to the money and it is not "against good conscience" to let him keep it, *cf. Golde Clothes Shop v. Loew's Buffalo Theatres*, 141 N.E. 917, 919 (N.Y. 1923) (holding that the defendant was not sufficiently "innocent" for an unjust-enrichment claim when it understood the risks), or (2) they formed a contract at the meeting, so, as explained above, there can be no unjust-enrichment claim.

## CONCLUSION

For these reasons, the Court awards 7% in EDAN to Hananya, but the parties' requests for relief are otherwise DENIED. The Clerk of Court is directed to enter judgment in favor of Hananya on his breach-of-contract claim seeking 7% of EDAN. Otherwise, the Clerk of Court is directed to enter judgment for Defendants on Plaintiffs' claims and for Plaintiffs on Defendants' claims. The conditional assignment for Patent No. 8402876 at Reel/Frame No. 055346/0892 is CANCELED. The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: May 10, 2024
New York, New York

ARUN SUBRAMANIAN
United States District Judge